UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | |
| UNSECURED CREDITORS' COMMITTEE OF THE CHURCH EXTENSION OF THE CHURCH OF GOD, | ) ) ) ) | |
| Intervening Plaintiffs, | ) ) | CASE NO. 1:02-cv-1118-DFH-VSS |
| v. | ) ) | |
| CHURCH EXTENSION OF THE CHURCH OF GOD, INC., UNITED MANAGEMENT SERVICES, INC., JAMES PERRY GRUBBS, and SHEARON LOUIS JACKSON, | ) ) ) ) ) | |
| Defendants. | ) ) | |

ENTRY ON RULE 50 MOTION

A jury found that defendants J. Perry Grubbs and S. Louis Jackson violated federal securities laws by fraudulently and negligently making false and misleading statements to buyers of investment notes issued by Church Extension of the Church of God, Inc.  Defendants have moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.  For the reasons explained below, the motion is denied.

I.      *Factual Background*

The Church of God is a Christian denomination founded in 1881.  Its headquarters are in Anderson, Indiana.  In 1921, the Church of God established the Church Extension of the Church of God, Inc. ("CEG") as a not-for-profit corporation to help finance the construction and expansion of local churches. CEG raised money by gifts and by selling investment notes, primarily to members of the Church of God.  CEG then loaned money to local congregations to help them buy, build, and expand local church properties.  The CEG loans to local congregations were secured by mortgages on the properties.  The payments by the congregations were used to re-pay the investors.

From 1992 until the end of 1995, CEG's balance sheet showed a negative net worth.  Because of the negative net worth during those years, state securities laws prevented CEG from selling new investment notes.  Beginning at the end of 1996, the balance sheet showed positive net worth, though the net assets remained modest, as reported to potential note buyers.   For purposes of evaluating the materiality of the issues discussed below, it is helpful to know that CEG reported its net assets and total assets as follows for the years ending:

|      | Net Assets | Total Assets |
|------|-----------|--------------|
| 1995 | $   195,425 | $ 50,069,362 |
| 1996 | 506,363 | 63,075,100 |
| 1997 | 602,139 | 94,842,522 |

| 1998 | 2,030,510 | 121,731,319 |
| 1999 | 2,260,753 | 137,752,447 |
| 2000 | (318,349) | 156,032,260 |
| 2001 | 245,052 | 153,584,564 |

Ex. 67 at page 2 of consolidated financial statements; Ex. 98 at 005598; Ex. 206 at 1, 9-10.  (The financial statements for 2001 did not have an opinion from an outside auditing firm.)

From 1996 until the spring of 2002, CEG sold about $85 million in investment notes.  By the end of 2001, CEG owed note holders a total of more than $80 million.  By the spring of 2002, CEG was insolvent.  The United States Securities and Exchange Commission ("SEC") filed this action against CEG, a wholly-owned subsidiary called United Management Services, Inc. ("UMS"), and Mr. Grubbs and Mr. Jackson.  Mr. Grubbs was CEO of CEG, and Mr. Jackson was president of UMS.  Under an agreement between the SEC and new CEG and UMS management, and with oversight from a court-appointed conservator and receiver, CEG has been winding up its affairs by liquidating assets to pay creditors, including note holders.  At trial, the court-appointed receiver estimated the final result will probably mean losses for note holders of between $20 million and $40 million.

From 1996 to 2002, CEG strayed from its original focus on providing loans to local congregations.  CEG began investing heavily in non-church real estate.

By the end of 2001, CEG's assets included only $14.5 million in loans to local Church of God congregations.  The other reported assets included many millions invested in low-income housing projects and an abandoned hospital in Texas, among other properties.  From a financial standpoint, at least, many of these investments were disastrous for CEG.  They were also carried on the books at excessive values, giving the impression that CEG was in stronger financial condition than it actually was.

The issues in this case are not whether the CEG investments in these properties were wise or prudent, or whether they were motivated in part by a desire to expand the ministry of the Church of God.  The SEC has alleged, and the jury has found, that defendants Grubbs and Jackson violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, Grubbs by misleading the buyers of the notes about how the proceeds would be used, and both defendants by misleading buyers about CEG's financial condition.[1]

---

[1]Section 17(a) of the 1933 Securities Act provides:

(a) Use of interstate commerce for purpose of fraud or deceit
It shall be unlawful for any person in the offer or sale of any securities or any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a
(continued...)

II.    *Rule 50 Standard*

On an issue tried to a jury, the court may grant judgment as a matter of law

only where "there is no legally sufficient evidentiary basis for a reasonable jury"

---

[1](...continued)
material fact or any omission to state a material fact necessary in order to
make the statements made, in light of the circumstances under which they
were made, not misleading; or
(3) to engage in any transaction, practice, or course of business which
operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).  Section 10(b) of the 1934 Securities Exchange Act provides in
relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any
means or instrumentality of interstate commerce or of the mails, or of any
facility of any national securities exchange –
* * *
(b) To use or employ, in connection with the purchase or sale of any security
registered on a national securities exchange or any security not so
registered, or any securities-based swap agreement (as defined in section
206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device
or contrivance in contravention of such rules and regulations as the
Commission may prescribe as necessary or appropriate in the public
interest or for the protection of investors.

15 U.S.C. § 78j(b).  SEC Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any
means or instrumentality of interstate commerce, or of the mails or of any
facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a
material fact necessary in order to make the statements made, in the light
of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or
would operate as a fraud or deceit upon any person, in connection with the
purchase or sale of any security.

17 C.F.R. § 240.10b-5.

to find for the non-moving party on the issue.  Fed. R. Civ. P. 50.  The Supreme Court has explained:

> in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.  In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.  *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-555 (1990); *Liberty Lobby, Inc.*[*v. Anderson*, 477 U.S. 242, 254 (1986)]; *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, n. 6 (1962).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Liberty Lobby*, *supra*, at 255.  Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000).

Thus, in addressing defendants' motion for judgment as a matter of law, the court reviews the evidence in the light most favorable to the SEC, granting it every reasonable inference that the jury might have drawn in its favor.  *E.g.*, *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 924 (7th Cir. 2000); *Frazier v. Norfolk & Western Ry. Co.*, 996 F.2d 922, 924 (7th Cir. 1993).  The court may not "reweigh or reevaluate the evidence – that task is reserved to the jury as factfinder."  *Frazier*, 996 F.2d at 924, quoting *Siddiqi v. Leak*, 880 F.2d 904, 908 (7th Cir. 1989).  The court may set aside the jury's verdict and enter judgment as a matter of law only when the evidence is such that, without resolving conflicts in the testimony or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable jurors could have reached.

*Lane v. Hardee's Food Systems, Inc.*, 184 F.3d 705, 706-07 (7th Cir. 1999); *Klunk v. County of St. Joseph*, 170 F.3d 772, 775 (7th Cir. 1999).

III.   *Material Misrepresentations and Omissions*

The parties tried the case on the theory that the relevant disclosures to note buyers were those in the Offering Circulars that accompanied each issue of notes. The Offering Circulars typically consisted of about 20 pages of text supplied by CEG, followed by financial statements audited by an outside accounting firm.[2]

The SEC contended at trial that the Offering Circulars contained material misrepresentations and omitted material information in two respects. First, the SEC contends the Offering Circulars falsely described the intended use of the proceeds of note sales as primarily to fund loans to local churches. Second, the SEC contends the Offering Circulars falsely described the financial results of key purchases of properties through bargain sale transactions, which had the effect of misrepresenting CEG's overall financial condition.

The Offering Circulars contain a considerable amount of information about both of those subjects. The parties debated their meaning. Whether an offering circular, prospectus, or similar document contains a material misrepresentation

---

[2]For the last issue of notes in 2002, the financial statements were not accompanied by an opinion from an accounting firm. The jury could reasonably infer from the evidence that no accounting firm was willing to put its reputation on the line with those financial reports.

or omission is ordinarily a jury question. *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) (reversing dismissal under Rule 12(b)(6): "adequacy of disclosure is normally a jury question"); *Harris v. Union Electric Co.*, 787 F.2d 355, 364-65 (8th Cir. 1986) (affirming jury finding of fraudulent omission); *SEC v. Seabord Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982) (reversing summary judgment for defendants on issue of whether prospectus was misleading). Defendants contend, however, that the evidence on this point is so clear that no reasonable jury could find that the Offering Circulars were materially misleading.

The jury was instructed in part:

> To determine the truth and accuracy of the information that was provided to potential investors in the offering circulars, you should consider each offering circular as a whole, including the financial statements and the accompanying notes. You should not focus your attention solely on selected words, phrases, or sentences contained in the offering circulars, particularly where statements in different portions of an offering circular are relevant to a particular point, such as the use of proceeds from sales of the notes or the income recognized as a result of "bargain sale transactions." You should consider what a reasonable investor who has read an entire offering circular would understand the meaning of that circular to be.

With these standards in mind, the court turns to the evidence on the use of proceeds and then on the financial results of the bargain sale transactions.

A.     *Use of Proceeds*

During the years at issue here, CEG sold $85 million in notes. By the end of 1999, less than 25 percent of the note proceeds were used for loans to

churches.  At that time, CEG had sold outstanding notes totaling more than $70 million.  Its outstanding loans to churches totaled only $16 million.  By the end of 2001, the CEG notes totaled more than $81 million, and the church loans had dwindled to less than $15 million, or less than 20 percent of the outstanding notes.  Also, during this period, CEG had subsidized its wholly-owned subsidiary UMS to the tune of approximately $30 million.  Those were the realities.  What CEG said about these subjects was very different.

The Offering Circulars addressed the use of proceeds in several places, and there were some changes after the 1999 issue.  The 1996, 1997, 1998, and 1999 Offering Circulars contained the following statement in the "Use of Proceeds" section:

> Funds received from the sale of the Notes in this State and in other states will be added to the Board's general funds.  The Board's general funds are primarily used to make loans to local congregations and other affiliated units of the Church to finance site acquisition and capital improvement projects, including the construction of new church facilities and the remodeling and/or purchase of existing church facilities in the United States and Canada and to fund other projects of the Board.

Ex. 66 at 6 (1996); Ex. 67 at 5 (1997); Ex. 68 at 5 (1998); Ex. 96 at 5 (1999).

Focusing for convenience on the 1999 Offering Circular (Exhibit 96), these earlier Offering Circulars also included the following statements about the use of proceeds at page 2:

> The primary use of the funds acquired through this offering is to financially assist, through the funding of first mortgage loans, local congregations and

other affiliated units of the Church, some of which may not be able to finance their capital expansion projects from commercial loan sources at prevailing rates of interest and to fund other projects of the Board.

At page 4 in the introduction:

> Since its inception in 1921, one of the assignments of the Board has been to be the principal organization responsible for the church extension functions of the Church. In furtherance of this purpose, it has instituted a program of selling Investment Obligations, the proceeds from which are utilized primarily for first mortgage loans to local congregations and other affiliated units of the Church to finance their capital improvement projects, including church buildings and related structures. See "The Board's Lending Activities."

The 1999 Offering Circular stated at page 5 in "Risk Factors":

> The Board's loans are made primarily to local congregations and other affiliated units of the Church.

From page 5 in "Use of Proceeds":

> It is anticipated that a portion of the proceeds of this offering will be invested by the Board in certain investment securities or other reserve accounts pending their utilization for the Board's lending function or in furtherance of the Board's policy of maintaining a reasonable degree of liquidity. See "Financing the Board's Activities."

From page 12, "The Board's Lending Activities":

> The Board intends to utilize a substantial part of the proceeds from this offering, from offerings in other states and from future offerings, to fund loans to local congregations or affiliated units of the Church. Pending the utilization of the funds, the Board may invest such proceeds.

At page 13, the 1999 Offering Circular addressed subsidiary corporations and especially UMS. After including UMS as a "mission related" subsidiary, the Offering Circular stated:

> These mission-related corporations budget their expenses and generate their own income from contributions and fees charged for services rendered. Management is of the opinion that the maintenance of these corporations will not materially affect the operation of the Board in pursuit of its exempt purposes, except to the extent of increasing the Board's equity and net operating revenue. The subsidiaries are to be self-sustaining. It is not the intent of the Board to utilize proceeds from the sale of Investment Obligations to fund subsidiary operations.

The Offering Circulars were modified beginning in 2000 when a new attorney began advising CEG on securities laws. On the issue of the Use of Proceeds, the 2000 Offering Circular (Exhibit 98) included the following information.

Under the heading "Use of Proceeds," the Summary stated: "We add the proceeds of the sale of our Notes to our general funds and primarily use them to make loans to Church Organizations to finance capital improvement projects and in part to support our other church extension ministries." Under the heading "Church Extension's Lending Activities," the Summary stated: "We use the proceeds from the sale of our Notes primarily to make loans to Church Organizations, generally secured by first mortgages. These loans are predominantly for the construction, repair, renovation of churches, parsonages and related facilities and the refinancing of such obligations at interest rates normally comparable to prevailing commercial loan rates." The Summary also

stated under the heading "Other Church Extension Activities":  "We also have certain investment properties, obtained to a great extent through gifts, and other church extension ministries, i.e., youth, elder care and affordable housing ministries.  We maintain these holdings and activities either directly or through wholly owned or controlled subsidiary companies."  Ex. 98 at 4-5.

The 2000 Offering Circular provided more detail in the following pages.  At page 7, as part of "Risk Factors," it stated:  "In addition to our lending function, we conduct some of our operations through ministry-related subsidiary corporations.  These corporations have their own sources of earned and donated income and budget their expenses.  Should the revenues needed to operate these other activities decline substantially, it may be necessary to use revenues from our general funds to fund a portion of these other ministries."

A more detailed statement was provided in "Use of Proceeds":

We add the funds received from the sale of the Notes to our general funds. We primarily use our general funds to make loans to Church Organizations to finance site acquisition and capital improvement projects, including the construction of new church facilities and the remodeling and/or purchase of existing church facilities in the United States and Canada and to fund other of our projects. * * * It may be necessary to use a portion of our general funds to support our other church extension ministries, i.e., youth, elder care and affordable living ministries.

Ex. 98 at 8.

On the subject of CEG subsidiary activities, the 2000 Offering Circular included the following statement about UMS, the wholly owned subsidiary managed by defendant Jackson:

> These ministry-related church extension programs budget their expenses and generate their own income from contributions and fees charged for services rendered.  In our opinion the maintenance of these programs will not materially affect our operations in pursuit of our exempt purposes, except to the extent of increasing our equity and net operating revenue.  The subsidiaries are intended to be self-sustaining.  Some of the proceeds from the sale of our Notes help fund these ministries, but we intend as soon as possible to use these proceeds solely to funds [sic] our loans to Church Organizations and to maintain our Liquid Reserve Funds.

Ex. 98 at 21.  In light of the issue defendants have raised about whether they were responsible for the language in the Offering Circulars, it should be noted that attorney Terry Eads testified that he based these changes in the 2000 Offering Circular on conversations with both Grubbs and Jackson.  2 Tr. 278-81.

As part of the detailed description of CEG's lending activities, the 2000 Offering Circular stated: "We intend to use a substantial part of the proceeds from this offering and from future offerings of our Notes, as well as the proceeds from the sale of our GICs [guaranteed investment contracts], to fund loans to Church Organizations."  Ex. 98 at 21.

The SEC argued to the jury and argues now that these statements about the use of proceeds were misleading because the proceeds were not used primarily to make the low risk loans to church congregations, secured by first mortgages, and

because the note proceeds were used to finance the operations of CEG subsidiaries, especially UMS and its commercial investments and other forms of ministry, such as the low income housing projects.  Grubbs and Jackson offer three principal arguments why there was nothing misleading in the Offering Circulars concerning the use of the proceeds of note sales.

1.      *". . . And To Fund Other Projects of the Board."*

First, defendants rely on the last eight words of the key sentence:  "The Board's general funds are primarily used to make loans to local congregations and other affiliated units of the Church to finance site acquisition and capital improvement projects, including the construction of new church facilities and the remodeling and/or purchase of existing church facilities in the United States and Canada *and to fund other projects of the Board.*"  Ex. 96 at 5 (emphasis added). Defendants argued to the jury and argue now to the court that the key adverb "primarily" applies to everything in the sentence, including funding "other projects of the Board," so that the proceeds could be used "primarily" to fund any project the Board approved, such as the various commercial real estate investments in question here.   Thus, defendants conclude, there could have been no misrepresentation of the use of proceeds.

This argument presents at best a jury question, especially in light of all the other statements in the Offering Circulars quoted above that did not include the "fund other projects" escape clause.

Most important, there was substantial evidence that the defendants, the CEG board, and their advisors did not interpret the language this way, at least before the litigation.  Defendant Grubbs' annual report of the CEG president for the year 2000 stated:  "We add the proceeds of the sale of our notes to our general funds and primarily use them to make loans to church organizations to finance capital improvements and, in part, to support our other Church Extension ministries."  Ex. 207 at 2.  In his trial testimony, Grubbs tried to avoid the clear meaning of his report, 4 Tr. 771-74, but the jury was not required to accept his testimony.  CEG's securities attorney Terry Eads testified that he thought the "Use of Proceeds" sections in the Offering Circulars he reviewed from before 2000 indicated that the proceeds of the note sales were used primarily for loan purposes, and that it was clear from the financial data that the proceeds from the sale of notes had not been used primarily for loan funds.  2 Tr. 272.

Similarly, in October 2000, the CEG Board minutes reflect the following advice to the board:

> Gail Zimmerman [board member] reported that an SEC attorney has indicated that CE [Church Extension] may need to restructure or redirect activity to more accurately reflect what we are already doing.  Care must be taken to ensure that we are complying with information distributed in our circular.  *According to the attorney, 75-80 % of the investment dollars taken in should be used for loans*; we need to have 5% in liquid reserves; and our net worth should be about 3% of our total assets.

> Perry [Grubbs] will work with staff to develop recommendations for any restructuring that may need to occur.

Ex. 220 at 15 (emphasis added).  The Board minutes for April 2001 also reflect this understanding of the Offering Circulars on this issue:

> The Chair pointed out that our securities attorney encourages us to remain aware of what percentage of our total assets are used for core ministries and to keep the percentages in line with what is published in our circular. *The circular indicates that investments are primarily used for church loans and in part to support other CE ministries*.  Our attorney recommends that 60-70 % of investments should be used for church loans.

Ex. 257 at 13 (emphasis added).  In other words, the defendants are relying on an interpretation of the Offering Circulars that was not offered until this litigation.  The jury could reasonably find from the Offering Circulars, reading each one as a whole, that CEG was saying that note proceeds would be used *primarily* for loans to local church congregations and *in part* for other purposes.  By 1999, less than 25 percent of CEG's assets were held in the form of loans to local church congregations.  That percentage continued to decline in the following years.  The jury could easily find that the descriptions of the primary uses in the Offering Circulars were misleading.[3]

---

[3]This conclusion applies to the Offering Circulars both before and after the revisions recommended by attorney Eads in 2000.  The Offering Circulars in 2000, 2001, and 2002 contained some language giving CEG more flexibility in its use of proceeds, but the jury could reasonably find that the documents contained enough assurances about primary use for church loans to render the documents misleading.  Defendants also argue that "primarily" does not imply a particular percentage.  The interpretation of the word (in context) was a jury question, and the Board minutes provided evidence that the jury could rely upon to conclude that actual use of proceeds was dramatically different from the description.

2.    *CEG's Attorneys and Accountants*

Second, defendants point out that CEG's outside accountants and attorneys who assisted in preparing the Offering Circulars testified that they did not believe the Offering Circulars misrepresented the use of proceeds from the note sales. That was testimony helpful to the defendants, but it was not binding as a matter of law on the jury.  The jury could take into account the interests of those accountants and attorneys in defending work with which they were associated. The jury could also consider the fact that the accountants and attorneys were not chiefly responsible for the narrative portions of the Offering Circulars that were misleading.  The jury could also consider the fact that the accountants and attorneys did not have all the evidence that the jury heard or all the information that Grubbs and Jackson had about the use of proceeds.

3.    *The Financial Statements*

Third, defendants argue that the financial statements that were part of the Offering Circulars showed how much money was being used for church loans and how much was being used for other purposes.  Defendants point out that the accountant who testified for the SEC actually drew all the relevant information for his key summary exhibits from the financial reports in the Offering Circulars themselves.  See Exs. 319, 320, 321.  How could the Offering Circulars be misleading, defendants ask, if they contained the correct information about the actual use of the proceeds?

-17-

The Supreme Court has answered the question in the closely related context of proxy statements:

> But not every mixture with the true will neutralize the deceptive.  If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow.  *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1297 (CA2 1973) ("[I]t is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts").  Cf. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) (a defamatory assessment of facts can be actionable even if the facts underlying the assessment are accurately presented).  The point of a proxy statement, after all, should be to inform, not to challenge the reader's critical wits.

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991).  Similarly here, the Offering Circulars were supposed – were required – to inform note buyers, not to challenge their critical wits in a hunt for contradictions between the narrative and the financial statements.  Also, the jury was entitled to reject this argument in light of Grubbs' testimony claiming that he did not have the knowledge or expertise to notice or comprehend the apparent contradiction between the narrative and the financial statements.  The jury was entitled, of course, to reject Grubbs' testimony, but the fact that he even tried to claim he did not understand the apparent contradictions undermined any argument that the note buyers should have seen them as well.[4]

---

[4]In *Virginia Bankshares,* the Supreme Court went on to explain that if the inconsistency would "exhaust the misleading conclusion's capacity to influence the reasonable shareholder," a claim would fail for lack of materiality.  501 U.S. at 1097-98.  Defendants made such an argument to the jury in this case.  8 Tr. 1538-39.  At least on this record, that argument at most presented a jury issue, not entitlement to judgment as a matter of law.

4.    *Subsidy for UMS*

The defendants have not offered any rebuttal to the evidence that the Offering Circulars were misleading as to the role of CEG subsidiaries like UMS. The passages quoted above told note buyers that subsidiaries were self-sustaining. For example: "It is not the intent of the Board to utilize proceeds from the sale of Investment Obligations to fund subsidiary operations." Ex. 96 at 13 (1999 Offering Circular). The Offering Circulars did not tell note buyers that CEG had in fact subsidized UMS to the tune of about $30 million. That sum was huge in relation to CEG's net worth. A reader would not have understood that CEG would use note proceeds to subsidize commercial and other activities of subsidiaries on this scale, rather than using the proceeds "primarily" to fund church loans. This evidence also supported the jury's verdict as to whether the Offering Circulars were misleading.[5]

---

[5]The 2000 and 2001 Offering Circulars both stated:

> These ministry-related church extension programs budget their expenses and generate their own income from contributions and fees charged for services rendered. In our opinion the maintenance of these programs will not materially affect our operations in pursuit of our exempt purposes, except to the extent of increasing our equity and net operating revenue. The subsidiaries are intended to be self-sustaining. Some of the proceeds from the sale of our Notes help fund these ministries, but we intend as soon as possible to use these proceeds solely to funds [sic] our loans to Church Organizations and to maintain our Liquid Reserve Funds.

Ex. 98 at 21; Ex. 105 at 21. The April 2002 addendum included substantially similar language. Ex. 206 at 4. This statement comes close to an admission that the previous Offering Circulars had not described accurately either the use of proceeds of note sales or the condition of the subsidiaries, including UMS.

B.  *Financial Reporting of Bargain Sale Transactions*

The SEC's other theory is that the Offering Circulars also misled note buyers as to CEG's "bargain sale" transactions beginning in 1998 and continuing through 2002.  The transactions are described as bargain sales on the theory that CEG bought the properties for much less than their fair market values, and that the sellers intended to make a contribution to CEG in the form of the difference between sale price and fair market value.  Such a transaction may be entirely proper, of course.  The buyer and seller can properly treat the difference between fair market value and purchase price as a charitable contribution by the seller and as non-cash income for the buyer.  Also, for the properties at issue in this case, determining the difference between fair market value and the actual purchase price requires the exercise of judgment.

The bargain sale transactions were reported in the Offering Circulars, but the SEC contends that the reported values were deliberately, recklessly, and/or negligently distorted so as to show that CEG had a positive net worth when a fair evaluation of its condition would have shown that its debts exceeded its assets.  The SEC focuses primarily on a few large transactions, most occurring at the very end of a financial year, that made the difference between reporting positive and negative income for the year, and between reporting positive and negative net worth for the end of the year.  In these transactions, CEG usually paid substantial sums of cash and incurred obligations to continue paying cash to hold and operate these properties, while booking much larger sums of paper equity.

-20-

The 1999 Offering Circular (Ex. 96) stated at page 10:

> The Board has acquired, primarily through gifts, several real estate properties throughout the United States.  Some properties are held outright by the Board, and others (mostly commercial real estate) were held by the Board's property-holding subsidiary corporations.  The book value of the properties held by the Board and subsidiaries (at December 31, 1998, $9,771,312) is not normally included in the Board's reserves due to the lack of liquidity of these assets.  The Board is, however, benefitting from the collection of rents under several lease agreements concerning these properties.   Net rental income or loss, or funds transferred from subsidiaries, in relation to properties held by the Board are added to or deducted from the Board's general funds.   For the years ended December 31, 1998, 1997, and 1996, net rental income or loss amounted to $638,926, $555,323, and ($310,805), respectively.

At page 16, note 6 of the financial statements:

> Certain investment properties and properties held for sale valued at $1,014,787 are recorded as bargain purchases.  The Board, prior to accepting these gifts from a prospective donor, attempts to establish that the donor's primary intent is to benefit the Board's ministry.  The asset's fair market value is estimated by management before acquisition, it is purchased at less than fair value, and the difference is recorded as a non-cash contribution.  During 1998, 1997 and 1996, $0, $0 and $1,852,464 was recorded as non-cash contributions as a result of bargain purchases.

> Properties acquired in this manner often do not have readily ascertainable market values.   The primary basis for the value estimation of such properties has been use of appraisal reports obtained from independent professional appraisers.  Appraisals by nature include extensive estimates and valuation judgments and relates to a property's locations, its zoning, the demographics and/or economy of the surrounding area, environmental and other similar factors.  These factors, individually and collectively create inherent uncertainty in the valuation process, and estimated values may differ significantly from the values that would have been used had a ready market for the real estate investment existed.  Such differences could be material.

At page 25, note 17 of the financial statements:

-21-

During 1998 the Board acquired three apartment building rental properties operated under Sections 202 and 236 of the National Housing Act and regulated by the U.S. Department of Housing and Urban Development (HUD). These properties were acquired by an exchange of cash and certain investment properties. The former owner of the HUD properties (an unrelated not-for-profit organization) expressed its intent to contribute to the Board the excess fair market value of the HUD properties over the value of the assets exchanged. The Board obtained an independent MAI appraisal of the three properties. The appraised value exceeded the carrying value of the exchanged cash and investment properties resulting in a non-cash contribution of $5,428,669 which was recorded in the Statement of Activities. This was recorded as a Temporarily Restricted Contribution due to the HUD regulations that are in effect until the project mortgages are paid off.

The financial statements that were part of the 2000 Offering Circular included the following information about the transactions in question. Note 6 stated:

Investment properties and properties held for sale are recorded at fair market value, less costs to sell, and are handled as bargain purchases. Church Extension, prior to accepting these gifts from a prospective donor, attempts to establish that the donor's primary intent is to benefit Church Extension's ministry. The asset's fair market value is estimated by management before acquisition, it is purchased at less than fair value, and the difference is recorded as a non-cash contribution. During 1999, 1998, and 1997, $1,873,496, $151,641 and $0 was recorded as non-cash contributions as a result of bargain purchases.

Ex. 98 at 005608. The next paragraph duplicated that quoted above at page 21 from the 1999 Offering Circular concerning the use and risks of appraisals to determine fair market value. Similar warnings were included in Note 13, under the heading "Management Use of Estimates." *Id.* at 005614.

-22-

Note 17 reported on several of the key transactions at issue here.   It reported the receipt of three apartment building rental properties operated under subsidy programs funded by HUD.   The note reported:

> The former owner of the HUD properties (an unrelated not-for-profit organization) expressed its intent to contribute to Church Extension the HUD properties at fair market value.   Church Extension obtained an independent MAI appraisal of the three properties.   The appraised value exceeded the carrying value of the properties resulting in a non-cash contribution of $3,057,000 which was recorded in the Statement of Activities.   This was recorded as a Temporarily Restricted Contribution due to the HUD regulations that are in effect until the project mortgages are paid off.

> Also, Church Extension acquired 200 acres located in Austin, Texas under a bargain sale transaction.   Church Extension purchased the land for approximately $1,300,000 less than the appraised value.   Church Extension is exploring the use of this land for its affordable housing division.

Ex. 98 at 005616.  In fact, the Austin property was only 18 acres, and CEG had also agreed to guarantee payment of an additional loan of $2.5 million.

Defendants contend that these statements in the Offering Circulars were sufficient to inform note buyers about the nature and risks of these bargain sale transactions and CEG's accounting for them.  Defendants also point out that CEG obtained professional appraisals of the properties that it used to support its accounting for these transactions, and that it typically booked the assets at no more than 90 percent of the appraised value.

To support its claim of fraud in the accounting for these transactions, the SEC did not offer expert testimony to show that the appraisals were inflated and could not reasonably be relied upon.  Instead, the SEC relies on three principal types of circumstantial evidence.  First, the SEC offered the testimony of David Martin, who has helped manage the liquidation of the CEG assets.  Martin testified as to the actual proceeds of the sales of the assets in question.  These proceeds were compared to the equity that CEG booked on these transactions.  On the HUD II properties, CEG booked equity of $3,057,000 in 1999 and following years.  When the properties were sold, CEG realized net proceeds of less than one-twentieth that value, $150,000.  After it bought the abandoned hospital property in Austin in 2000, CEG booked $1.3 million in equity.  CEG was unable to realize any equity at all when it abandoned the property to foreclosure, and it wound up paying more than $400,000 in additional cash to cover the loan it had guaranteed for the seller.  The Pedigo property was booked with equity of $932,136, but the sale was estimated to produce net equity to CEG of only $25,000 to $50,000.  On the Indianapolis apartment properties purchased in 2001, CEG booked equity of $8.85 million.  The net proceeds on sale were estimated to be only $400,000 to $600,000.

The cumulative effects of these transactions are summarized on Exhibit 321.  As reported by CEG to note buyers, the bargain sale transactions showed that CEG's net income would have been negative in 1998, 1999, and 2001 if income from the transactions had not been recognized.  CEG's net income for

2000 was negative even though CEG recognized $3.5 million in non-cash income from bargain sales.  The cumulative effect from 1998 through 2001 was more than $22 million.  Without that recognized income, CEG's net equity would have dropped to a negative $22 million over those years, rather than the razor-thin positive equity of $245,060 that CEG reported in its unaudited 2002 addendum to the 2001 Offering Circular.  See Ex. 206.

Second, the SEC relies on evidence that Grubbs and Jackson fully appreciated the need for booking these transactions with sufficient equity to keep CEG's reported income and net assets in the black ink so CEG could keep raising funds.  Contemporaneous meeting minutes were rife with attention to the amount of equity CEG could book to enable it to keep selling more notes.  See, *e.g.*, Ex. 251 at 3 (CEG board minutes of Feb. 24, 1997, Jackson noted that a difficult bargain sale could allow CEG to register its securities in some states); Ex. 258 at 1-2 (CEG board minutes of Sept. 11, 2001 noting that proposed Indianapolis apartment transaction would bring substantial equity gain to CEG at time when advisers were telling CEG it could not sell new investments until its financial condition improved); Ex. 263 at 2 (CEG board minutes of Dec. 27, 2001 with Grubbs and Jackson discussing expected accounting effects of transaction on CEG equity); Ex. 270 at 3 (CEG board minutes of April 12, 2001 with Jackson reporting on expected equity gain to CEG); Ex. 276 (CEG annual report for 1999, noting that Jackson's goals for UMS in 1999 were to assist CEG in attaining $6 million in equity by end of 1999); Ex. 349 at 5 (CEG board minutes of July 1998

with Jackson recommending bargain sale in part because it "would result in tremendous equity gain" to CEG); Ex. 353 at 2 (CEG leadership team minutes of Aug. 11, 2000 noting that proposed transaction would result in net equity gain of $12 to 13 million). Although both Grubbs and Jackson tried in their testimony to minimize their understanding of and involvement in these accounting issues, the jury was entitled to credit the contemporaneous documents reflecting that they each had much greater understanding and involvement. The jury could also credit testimony from other witnesses, including CEG director Zimmerman and others who participated in the CEG decision-making to the effect that Grubbs and Jackson were well-informed about and engaged in the bargain sale transaction decisions and the accounting for them. See, *e.g.*, 7 Tr. 1350-52 (Zimmerman testimony about Jackson's understanding of transactions).

Third, the SEC relies on evidence of suspicious discrepancies and behaviors on the part of the defendants. For example, when Capin & Crouse, who had been CEG's accountants, warned CEG management about its handling of bargain sale transactions back in 1994, see Ex. 348, CEG replaced them as the accountants. The successor accounting firm then effectively forced CEG to adjust its equity downward by $1 million. CEG chose not to rehire that firm, either. There were also many warning flags on the appraisals from Nick DeAngelis, who was involved in many of the transactions. Most compelling, when appraising the HUD properties, DeAngelis ignored the restrictions on rent levels imposed by the fact that they were in fact HUD properties.

In addition, the jury heard evidence that the abandoned hospital property in Austin was not properly accounted for because the property was in foreclosure at the time of the sale and because CEG did not disclose its guarantee of the seller's $2.5 million note at a time when it should have done so.  On the Indianapolis apartment complexes, the jury heard a complicated story from which it could reasonably conclude that the CEG board and management initially insisted on appraisals above $40 million.  Then, when time grew short and CEG needed the deals to show positive income and net worth at the end of 2001, CEG went ahead with the transactions and booked an unjustifiable $8.85 million in equity.  The jury also heard that the financial statements reflecting these transactions were not audited by an outside firm, from which it could conclude that no reputable accounting firm was willing to sign off on the inflated figures.

Defendants have offered evidence and arguments to rebut these charges. They correctly point out that Martin did not testify as an expert and that there are many possible reasons to explain why the actual sale prices for these assets wound up being so much lower than the equity CEG had booked.  The jury was cautioned about the danger of using hindsight to conclude that statements that later turned out to be wrong must have been dishonest at the times they were made. Defendants also point out that the Offering Circulars repeatedly stated that these assets were valued based on appraisals with substantial elements of subjectivity.

These arguments were entirely appropriate for the jury, but they do not rebut the SEC's case as a matter of law.  Yes, there are lots of reasons to use caution in evaluating Martin's testimony and in evaluating the circumstantial evidence of intent.  And yes, the Offering Circulars did warn about the judgmental and subjective character of the appraisals.  But these arguments go to the weight of the evidence.  The jury was entitled to consider the sheer volume of the discrepancies between CEG's booked values and the sales proceeds a few years later, as well as the consistent pattern of year-end transactions used to boost CEG's books into the black.  The court is satisfied that the jury could reasonably conclude from the magnitude of the losses and the pattern of these transactions that the Offering Circulars did not reflect honest judgments about the values of these properties, and that the cumulative effect was to inflate dishonestly the financial condition of CEG so as to continue to induce church members and others to buy notes from an entity that was insolvent.

In sum, the jury's verdicts on the issue of fraudulent and/or negligent misrepresentations and omissions is supported by sufficient evidence regarding both the use of note proceeds and the accounting for the bargain sale transactions.

IV.     *Substantial Participation*

Both defendants also challenge the sufficiency of the evidence as to whether they could be held individually responsible for misleading representations and

omissions in the Offering Circulars.  The documents were group efforts, of course, with other CEG and UMS managers and outside lawyers and accountants all involved in various aspects of their preparation and review.  Jury Instruction No. 17 told the jury that each defendant could be found liable only for his own actions or those he directed or caused to occur.  The test was framed in part in terms of whether the defendant "substantially participated" in providing false or misleading information to investors.  See generally *SEC v. Holschuh*, 694 F.2d 130, 139 & n.13 (7th Cir. 1982); *Kaufman v. Motorola, Inc.*, 1999 WL 688780, at *12-13 (N.D. Ill. April 16, 1999) (Williams, J.); *Cashman v. Coopers & Lybrand*, 877 F. Supp. 425, 432-33 (N.D. Ill. 1995); see also *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F. Supp. 2d 549, 588-90 (S.D. Tex. 2002); but see *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (applying "bright line" test for primary liability).  Counsel argued the issue of substantial participation to the jury.  The court concludes that the evidence was sufficient to present an issue for the jury to decide with respect to both defendants.

A.    *J. Perry Grubbs*

Grubbs became the president and chief executive officer of CEG in 1987. In favor of the defense, the jury heard evidence that Grubbs was trained in music and music education rather than finance and accounting, and that his principal qualification for the job was his talent for attracting gifts from contributors rather than managing a business.  From the defense perspective, the SEC is trying to

hang the responsibility for the collapse of CEG on Grubbs simply because he was the CEO and it happened on his watch.

The SEC's case against Grubbs has considerably more substance.  The jury also heard and read a substantial quantity of evidence showing that Grubbs was knowledgeable in the subjects of this litigation:  the use of the proceeds of note sales, the bargain sale transactions, their accounting, and the role that the accounting played in enabling CEG to continue selling notes at times when a realistic assessment of its financial condition would have shown it was insolvent. That involvement is apparent from the board and leadership team minutes, including those cited above at pages 25-26.  Those records show that Grubbs was constantly involved in the bargain sale transactions that were used to move CEG from red ink to black at the ends of its fiscal years.  He understood the need to show positive income and equity, and he understood the critical role of the bargain sale transactions.

Defendant Grubbs minimized his own role in reviewing and approving the Offering Circulars, but he admitted that he at least read the Introductions to ensure that they were accurate and did not mislead investors.  4 Tr. 741-42 (using 1996 Offering Circular as example for discussing general practices).  Those portions included those telling investors that the proceeds would be used primarily for loans to local churches, secured by first mortgages.  Also, of course,

as CEO Grubbs was in a position to require that the Offering Circulars reflect his views.

The jury also heard evidence from Arthur Lewis that Grubbs personally led CEG's shift away from traditional church loans to the greater variety of investments that produced so much trouble.  Tr. 97-100.  The jury could easily find that Grubbs knew and understood how CEG was actually using the proceeds from the note sales.  The jury could also choose not to credit Grubbs' testimony about his supposed lack of sophistication, understanding, and involvement.  His testimony was impeached a number of times, especially using the contemporaneous documents from CEG board minutes and leadership team minutes.  Giving the SEC the benefit of reasonable inferences from the evidence, the jury could reasonably conclude that Grubbs knew that the Offering Circulars he was approving did not accurately describe the actual use of note proceeds, or at the very least that he was reckless in approving the documents without reading more than a few lines in them.  That line of reasoning from the evidence is sufficient to uphold the jury's fraud verdict against Grubbs, whether it deemed his actions knowingly fraudulent or reckless.

The jury could also reasonably find that Grubbs substantially participated in misleading investors with respect to the bargain sale transactions and the overall accounting for CEG's income and equity.  The major transactions were all the subjects of leadership team and board discussions in which Grubbs

-31-

participated.  Grubbs was involved in replacing accounting firms that questioned CEG's accounting for the bargain sale transactions, and the sheer number of bad transactions and the cumulative effects of putting CEG's accounting out of line by at least $20 million also lend support to the jury's finding of liability on the part of Grubbs.

In addition, giving the SEC the benefit of conflicts in the evidence, the SEC offered evidence of Grubbs' direct involvement in acquiring the abandoned hospital in Austin and the accounting that added $1.3 million in paper equity for a property that was essentially worthless and that took more than $1.6 million in cash from CEG.  The jury heard evidence that he instructed the accountants how the transaction should be booked.  And Grubbs testified that the Austin property was in foreclosure as early as July 1999, before CEG closed on the property.  5 Tr. 872-74.  Accountant Steve Stuckey testified that the loan default and foreclosure meant that CEG could not treat the $2.5 million guarantee as a non-reportable contingent liability.  Instead, if Grubbs had told the accountants what he told the leadership team, CEG should have reported the $2.5 million note as a current liability.  That would have made CEG's financial picture look considerably bleaker. The jury also heard evidence that Grubbs instructed a subordinate to "bury" an appraisal that called attention to environmental problems that undermined the claim that the transaction added to CEG's equity and income.  Defendants offered evidence and arguments to rebut that evidence, but it was the jury's task to weigh the competing evidence.

B.     *S. Louis Jackson*

The evidence showed that defendant Jackson was deeply involved in all of the bargain sale transactions and in the valuations that were used to book the additional claimed income and equity.   The board minutes show that he understood the need for the year-end transactions to keep CEG in the black.

The SEC's strongest evidence against Jackson concerned CEG's purchase of two apartment complexes in Indianapolis at the end of 2001, which was used to put CEG barely into the black for the end of the year.   CEG booked an equity gain of $8.85 million on the transaction.   Even with that gain, CEG reported its net equity for the end of 2001 as only $245,052.   Based on an appraisal of total value of $44 million, the CEG board was told that the equity gain would be $7.2 million.   The board wanted another appraisal and insisted that it be for at least $40 million for the transaction to be approved.   In fact, another appraisal came in addressed to Mr. Jackson, and it was for only $38.5 million, yet CEG booked equity of even more than the $7.2 million that had been based on a *higher* appraisal of $44 million.   The $38.5 million appraisal sent to Jackson was not shared with the CEG board.   There was enough circumstantial evidence here to allow the jury to infer that Jackson was responsible for the concealment of the low appraisal and ultimately for the deceptive information given to investors in early 2002.   Although Jackson formally retired at the end of 2001, evidence indicated he was still consulting for UMS and CEG until the middle of March 2002.   The jury could conclude that he continued to participate substantially in the

Indianapolis transaction and the accounting for it, and thus in providing misleading information to investors.

V.     *Negligence*

The jury found Grubbs and Jackson also acted negligently, which was sufficient to establish liability under Section 17(a)(2) of the 1933 Act, 15 U.S.C. § 77q(a)(2).  See *Aaron v. SEC*, 446 U.S. 680, 696-97 (1980); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453 (3d Cir. 1997).  The evidence that supported the fraud verdicts was easily sufficient to support the negligence verdicts.  The jury could easily find that Grubbs and Jackson failed to exercise due care toward note buyers.  They both were deeply involved in the key bargain sale transactions and the accounting for them, which they used to keep CEG in a position to continue issuing more notes to try to stay afloat.  On the issue of use of proceeds, Grubbs knew how proceeds were being used.  He reviewed the Offering Circulars before they were issued.  He had ample power and opportunity and ability to prevent the misstatements.  The jury could find that if he had exercised due care, the Offering Circulars would not have misrepresented the use of the proceeds of note sales.

*Conclusion*

This is an unusual securities fraud case.  The wrongs were not committed for personal gain.  They were committed to promote the work of a church agency and its mission work, to which both individual defendants have devoted much of

their own lives and resources.  Nevertheless, a greedy or malicious motive is not an element of a securities fraud claim.  Also, the defendants were raising money for their efforts not only by seeking charitable donations, but also by offering investments to note buyers who expected to be paid back and to be told the truth. And of course, the investors' losses resulting from the course of conduct here are too substantial to be overlooked  The evidence supports the jury's verdict that both defendants violated the law.  For the reasons set forth above, defendants' motion for judgment as a matter of law is hereby denied.

So ordered.

Date: December 9, 2005

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

David T.B. Audley
CHAPMAN AND CUTLER
audley@chapman.com

Terence G. Banich II
JENNER & BLOCK, LLD
tbanich@jenner.com

Brian C. Bosma
KROGER GARDIS & REGAS, LLP
bcb@kgrlaw.com

Ronald W. Buchmeier
HOPPER & BLACKWELL
rbuchmeier@hopperblackwell.com

Curtis J. Butcher
CURTIS J. BUTCHER & ASSOCIATES
curtisbutcherlaw@msn.com

Donald R. Carmody
CARMODY MCDONALD P.C.
120 South Central Avenue
Suite 1800
St. Louis, MO 63105

Tina K. Diamantopoulous
U.S. SECURITIES AND EXCHANGE COMMISSION
diamantopoulosk@sec.gov

Brian D. Gwitt
ICE MILLER
brian.gwitt@icemiller.com

John E. Hilton
CARMODY MACDONALD P.C.
120 S. Central Avenue
Suite 1800
St. Louis, MO 63105-1726

Jay P. Kennedy
KROGER GARDIS & REGAS
jpk@kgrlaw.com

Thomas M. Knepper
KNEPPER & GLADNEY
tk@kg-legal.com

Kenneth A. Kroot
JENNER & BLOCK LLP
kkroot@jenner.com

Tricia A. Leminger
KROGER GARDIS & REGAS
tal@kgrlaw.com

Elliott D. Levin
RUBIN & LEVIN, PC
edl@rubin-levin.net

Steven Justin Levine
SECURITIES AND EXCHANGE COMMISSION
levines@sec.gov

Frederick V. Lochbihler
CHAPMAN & CUTLER
lochbihl@chapman.com

Jeff Jacob Marwil
JENNER & BLOCK LLC
jmarwil@jenner.com

Sue Figert Meyer
RUBIN & LEVIN
sue@rubin-levin.net

Susan K. Roberts
STUART & BRANIGIN LLP
skr@stuartlaw.com

Shelley Smith
JENNER & BLOCK LLC
ssmith@jenner.com

Brian I. Swett
JENNER & BLOCK, LLC
bswett@jenner.com

John Robert Weiss
KATTEN MUCHIN ROSENMAN LLP
john.weiss@kattenlaw.com

Thomas P. Yoder
BARRETT & MCNAGNY LLP
tpy@barrettlaw.com

Peter Jonathon Young
JENNER & BLOCK, LLC
pyoung@jenner.com